Thank you. Good morning and may it please the court. William Besch for Berkley Assurance Company. This is a case about pollution liability insurance, a policy that's designed to provide important protection against tort and regulatory claims arising from accidental spills or releases of toxic substances. As with any liability insurance, it's not designed to protect against commercial risks. The district court made three legal errors that together or separately require reversal. First, the court simply refused to apply the contract liability exclusion in the trial. Why did you raise it at summary judgment if you argued it? It's a matter of law, so why didn't you raise it at summary judgment? To take the first part of the question first, it was agreed to be part of the trial procedure that the contract liability issue would be decided by the judge rather than the jury. That issue was recognized, but to get to the question about summary judgment, we simply had limited space and focused on the issue that Berkley itself raised from the outset, which in the order of analysis is the first issue to reach, whether the conditions for coverage were satisfied. So in other words, you don't get to the exclusions unless the conditions for coverage were satisfied, the claim was timely reported, and there was no admission of liability without Berkley's consent. Is there something in the record that said you're going to wait until after the trial is over and then raise that question? Yes. Well, first of all, CBG raised the contract liability at summary judgment, so it was before the court at summary judgment, and the court ruled that CBG, that issue was still live in the case. CBG was not entitled to summary judgment on that issue. And then in the pretrial proceedings, we discussed at the summary judgment and then in the pretrial conferences, we discussed what would be tried to the jury and what would not be tried to the jury. And what was agreed was that the issue, although it had not been resolved at summary judgment, really was an issue of, potentially an issue of law, depending on what the evidence showed. It was not an issue that needed to be addressed to the jury. So the court and the parties agreed that the jury would just be presented with the questions that we raised at summary judgment, as to which the court found there was a factual dispute. When was the claim made? I think Judge Floyd raises a good point. I was wondering myself why this wasn't raised at summary judgment, but even if we were to overlook that, the particular exclusion, you're raising an exclusion, and that runs into, it raised two questions with me. Number one, exclusions are to be read narrowly, and the insurer has a clear burden of proof on them. But in this case, there's an exception to the exclusion, and it says that the exclusion shall not apply to the liability of others, which CBG assumed in its contract with High. And in its contract with High, CBG assumed the obligations of others, here G and P, to pay High for property damages. So you face the initial problem of not having raised this at summary judgment, but then in addition, I'm not sure I'm persuaded as to why the exception to the exclusion wouldn't apply to you and render the exclusion nugatory. And so let me answer that question. The exception, you stated most of it correctly, but it's limited to where CBG is responsible for the tort liability of someone else. Not just the liability of someone else, but the tort liability of someone else. And nobody ever made a tort claim against G and P. There never was a tort claim. All that happened with respect to G and P. I thought at some point, that Berkeley either pled or argued that CBG had been negligent in its dealings with High because of the mold issue. And why is an actual claim required as opposed to a cause of action? More than a claim is required, because we're not, sometimes in liability insurance cases, you're talking about the duty to defend. So you're just looking at the scope of a claim, and you don't even need an express claim. Sometimes there can be an implicit claim. Here we're talking about just indemnity. So the coverage is limited to where CBG has established its legal liability, legal obligation to pay the amounts based on a tort claim. If they would have been liable in tort in the absence of a contract, just the general duty of good faith and fair dealing. Is it your argument that because they have a contract, that that abrogates any tort considerations? No, it just means that you have to, you can't have a tort claim where the contract governs. In other words, you can't just, where the owner had the right under the contract to require CBG. But the exception says a liability that would have existed in the absence of a contract. Right. And it seems like to me, if there were no contract, there would be tort liability. No, it doesn't. In the absence of a contract doesn't mean we pretend that CBG just happened to be there building buildings without a contract. What we suggest that it means is the liability that's created for the pollution has nothing to do with the contract. In other words, if CBG were to spill something that created toxic fumes and injured some tenants living at the property, the tenants made a claim or anybody made a claim against them, that would be just the ordinary obligation you have not to create hazardous conditions. If they spilled something that migrated onto a neighboring property. I thought that was the argument Berkley made in response to the district court's decision that the court couldn't figure out why anybody would buy this type of insurance. That's right. I don't know that there was, I'm not recalling any discussion about limitations on the way you read the exception to the exclusion because of that. I think it's the same issue. In other words, the district court's concern rightly was what does this policy actually cover if it has this contract liability exclusion? And those are examples of what it covers because those are claims that would exist even in the absence of any contractual obligations. But the only evidence here was that CBG intended and that the owner intended for CBG to deliver mold-free apartments. That's not a tort liability standard, that's a contract liability standard. And that's the standard that they agreed to comply with and all the work that was done replacing wallboard, repainting, replacing carpeting, replacing cabinets, that was all redoing their contract work. It was not pollution cleanup or response to it. I thought that it was agreed in this case that mold is pollution liability. No. All that was agreed was that mold is a pollutant named in the policy. Right. Well, if you didn't have mold in these buildings, they wouldn't have done any of the things you just listed. There's no question that mold is a pollutant, but that only answers part of the question. The question is, what's the claim? What's the basis for their liability to deal with the mold? Is it a tort claim? Is it a regulatory claim? Or is it a contract claim? And the record here was clear that it was a contract claim. It's a straightforward matter of contract interpretation here, and that is even if we overlook that you didn't raise this point in summary judgment, when the exception to the exclusion says plainly that it doesn't, the exclusion does not apply to the liability of others, and CBG and its contract with HAI assume the liability of others, which brings it right within the exception to the exclusion, and it's assumed the obligation of others, in this case G&P, to pay HAI for property damages. So why doesn't that just fit cleanly within the language of the exception to the exclusion? I mean, you read Judge Brinkema's comments, and she's frustrated because she doesn't understand exactly what this insurance policy covers. She wonders whether it really covers anything. You have a reason why, in your judgment, no part of C&B's claim is covered by the policy. You know, everything they claim, every little item of damage, every little matter of, oh no, the policy doesn't cover that, the policy doesn't cover that. So Judge Brinkema is asking, well, what does it cover? And I gave her two good examples that I've repeated here this morning. And one of the things, this is an odd sort of case because you had both a jury trial, and Judge Brinkema seemed to conduct a sort of a bench trial on the side. And that's how the contract liability issue. All right, but the point is they both arrived at exactly the same conclusions on a number of the questions for which you would think that the jury's verdict would be dispositive. But I'm just, the tenor I'm getting is that you wanted to get out of every little thing. And you did raise some questions, and the contract applies to provide coverage in other situations rather clearly, in my view. And then there are the further questions of dealing with notice and damages, which are classic reasonable time for notice and damages, which seem to be classic jury questions. So you want to just say, oh, the jury's view didn't matter here, or the contract didn't cover this, or, you know, one thing or another. You know, Judge Brinkema says, well, what did it? What use was it to these people that paid the premiums? And I gave her examples of that, and that didn't matter to her. Of course, it's not the court's role to second-guess the value of the policy. The only question is whether the coverage... No, it's your role to provide a recovery when the policy provides, when the policy makes you liable. That is your role, and the court's role is to make sure that you perform your role under law and under the insurance contract, and you're trying to get out of things. Only trying to get the policy to apply, the language of the policy to be applied. That's all we're... Trying to get out of the plain language of the policy, in some instances. And you're trying to escape the jury verdict in others. Not trying to escape the jury verdict, Your Honor. We're just trying to have the language of the policy be applied in a principled way, and I don't believe the District Court did that. All right. Thank you. Some rebuttal time as well. Thank you, Your Honor. Mr. Gold, happy to hear from you. Good morning, Your Honor. May it please the Court. Eric Gold on behalf of CBG Building Company, with me is my colleague, Warren Smith. As you all know, Berkeley has raised several issues here, but they really fall into three categories. First, Berkeley wants this court, as Your Honor just stated, to overturn the findings of the court and the jury that were sitting there in tandem, that CBG's notice was timely, that CBG did not assume or admit any liability, and that 100% of CBG's pled damages were covered. All the court has to do for a finding in CBG's favor on that is find sufficient evidence, which supported those findings. Berkeley also raises issues with the jury instructions and the verdict form. Again, the court can only overturn those in the finding of abusive discretion. Now, the third issue, and the one we spend most of the time on with Berkeley, was the argument of the application of the contract liability exclusion, which it raised, as you mentioned, at the 11th hour after summary judgment. Now, there was discussion about why that wasn't put on summary judgment, and counsel's view was that Judge Brinkman did rule on that. Judge Brinkman didn't really give any specific rulings on summary judgment. She simply kicked it to the trial. And I think what's important there is that, as you mentioned, Berkeley did concede on summary judgment that CBG was facing a tort liability. The specific quote from their brief is, this is a quote, to be eligible, the claim necessarily had to involve allegations, as in fact, it clearly did, that CBG had been negligent in failing to identify and contain mold outbreak. That is a clear, clear admission that CBG was in fact facing tort liability, in addition to contract liability. I also want to sort of set the stage with some context, which was important as we went through the trial proceedings, and which I think led Judge Brinkman to the- Proposing counsel's response in part, I take it, is that acknowledging the existence of liability would be insufficient, that it required some sort of a formal claim from HAAS in order for that to apply. So what's your response to that? There is nothing in the plain language of the policy that requires a specific claim. In fact, the language of the policy explicitly requires you to look at what would have existed in the absence of the contract. What would have happened means you don't have an actual claim. You don't have actual claims by the owner against CBG. And I think most importantly, or also importantly, the indemnity provision, which gets into the insured contract exception, the indemnity provision in CBG's contract with the owner, HAI, says we're going to indemnify you for any claims, expenses, etc., arising out of the negligence of my subcontractor. The purpose of that indemnity provision is to make sure that the owner doesn't have to go all the way downstream if there's issues during the project. You're building a 260-unit, three-building apartment complex. Any number of trade contractors have been made subcontractors by CBG. The owner doesn't want to have to deal with all of these individual trades. So what happens, and this is a normal contracting process throughout the industry, the owner puts in a prime contract with the general contractor. The general contractor assumes the liability of all of its subcontractors. So when something goes wrong, as it did here, the owner has a one-stop shop. The owner brings claims against the general contractor. The general contractor then has its own downstream claims against subcontractors. That's why you get a general contractor. Exactly. That's exactly right. And so that's the response to that. I do think that there are some higher-level context points as well. You know, Berkeley drafted and issued a construction professional policy and markets it to general contractors. You don't have to go any farther than a Google search and their website on this to show that this is a specialized type of insurance, marketed and directed to the construction industry and specifically to general contractors. And again, Berkeley knows when it issues the policy that this is the contractual relationship in the setups. So when it is issuing a policy to a general contractor, it knows that there's already a contract in place between the owner and the general contractor, general contractor to subs. It would make no sense to be issuing a policy with that in mind to this industry and then saying, but the contractual liability exclusion comes in and guts all coverage if the claim against you sounds in contract. It would gut the entirety of coverage. And I think more importantly, it would upend the entire industry. No one is buying this policy. And CBG didn't pay $282,000 in premium for the risk of toxic fumes. You're placing this policy for the potential that a widespread mold issue creates damage to otherwise non-defective work. And that's another issue I just want to raise very quickly. Many of the cases that counsel has cited in its brief on summary judgment and through this case are talking about the differentiation between defective work, pure defective work and coverage for that and coverage for the resulting damage caused by that defective work. This case has no single dollar related to defective work itself. Is it? Was this a new build project or was it a renovation? It was a brand new build. So it was outside of Charlotte. It was a three building, 260 unit apartment complex was built. Now, I want to go into some of the specifics we were just talking about, which is first liability in the absence of contract. Again, the language is we need to look at it except such liability that would have existed in the absence of such contract. The language makes clear that it does not apply in two ways. First, in the absence of contract. Both the Eastern District of Virginia in the AWP case, which quotes this court's ruling in Abiteco Services, explicitly find that the exclusion does not destroy coverage for the insured's own negligence, even that stemming from the insured's negligent performance of a contract. That's precedent here in the Fourth Circuit. Indeed, in AWP, the court held that because the insured plausibly states a claim that it could be held liable outside the contract, the exclusion does not apply. In the absence of the contract, CBG had a duty to exercise ordinary care, to build a building free of defects, free of mold, free of harmful conditions. A violation of that duty is negligence. And CBG faced that negligence claim. I don't want your time to get away from you without having the opportunity to talk about a few other things, in particular the bad faith counterclaim and the prejudgment interest. But before that, there were, even though opposing counsel didn't get to it in their argument, there were several questions about offset for damages. And two of those were a little confusing to me. One was a general conditions payment, and the other was general contractor fee. Both of which sound a lot like to me like deemed to profit and administrative overhead. And the insurance company says that there's a time and expense exception for that. But why doesn't that apply? To define those first, so to answer the question, why does it not apply? As we all know, exclusions must be read narrowly, is entirely on the insurance company to prove that an exclusion unambiguously applies. Now, record evidence here established, we had a person, the president of the company on the stand, explaining each of these individual line items went into them, how they calculated them. He was cross-examined. And the jury agreed, this is all damages arising out of Berkeley's breach. But neither one of those were for carpet, replacement drywall, paying the carpenters or the carpet folks or the painters to come in and fix it up. These seem sort of artificial constructs. They're not artificial. It's the way that the construction industry calculates the additional costs on top of the types of things you discussed, which are sort of the hard costs, paint, labor, materials, equipment, those types of things. And this is for things, as testified at trial, these are for things like supervision costs. CBG is a general contractor, so it has any number of folks on the job that are supervising the work. It also pays for things like porta-potties. It pays for dumpsters. It pays for the trailers. It pays for cell phones. It pays for all of these other expenses that would go into any general contractors. In reading the policy, the terms of the coverage are actually pretty broad. Talks about coverage of sort of cleanup, abatement, remediation. That's a pretty broad spectrum. They're of damages that the contract would cover. And each of those different items, I guess, was a three-day trial. I guess each of those different items of damage was argued and explained. I mean, the trial went item by item to the point of even talking about the need to have toilets on site for the thing. All of the great many incidental expenses, expenses incidental to mold remediation. You have to bring in a bit of a support structure when you're engaged in mold remediation. It's not the kind of thing, any of us have dealt with mold remediation. It's not the kind of thing you just snap your fingers on and the mold is gone. Mold is a stubborn thing and you gotta power wash it. You gotta have workers on site. You gotta have port of toilets or whatever it is. The policy is fairly broad in terms of the coverage there. And of course, the CBG settlement with HIE included compensation for HIE's own cleanup. But the one thing I was struck with here was the thoroughness with which the items of damage were covered and they were matched up with the policy. And then the jury made his judgment. And it seems to me the kind of thing in this damage calculation, when it was as thorough as I thought it was here, that we would credit the jury and the conclusion that it came up with. And it was a conclusion that Judge Brinkema saw no reason to set aside. I mean, that was sort of the way I looked at it. That a lot of these things, like the reasonableness of notice and items of damages, a lot of these things, they say, well, they weren't covered by the contract, but I'm not sure they're contractual questions. I think they seem more like jury questions. That's exactly right. We could not have completed the remediation without those costs. And it was a painstaking day of the massive binder worth of invoices and in-the-weeds calculations of all these damages. But even if that covers the general conditions item, the general contractor's fee part wasn't for port-a-johns, cell phones, any of that stuff. It is, Your Honor. How could both of those damage calculations cover the same thing? It's different time periods. As part of your base contract scope, you identify a general contractor amount that you're going to get per month. Here it was $112,000 a month. This mold remediation lasted eight total months. And it's partly because of where the building, the construction of the buildings were. They were one, two, and three. One was basically done. Two was close. Three was probably 30, 40% done. There's mold found in building two. Tenants are already moving into building one. So the whole process took eight months to remediate through the entirety of the project. As part of this, you had four additional months on the back end that were never part of the original contract scope. That is the general conditions. $112,000 times four. That's how you get to that number. During, but again, it was an eight-month process. So that's the back end four months. Those initial four months, in addition to mold remediation, which is, as Judge Wilkinson just said, significant scope of work happening. That's in addition to base scope, forward-moving normal work that's happening. The $112,000 during those four months is paying for the forward-moving work. But now you have all of this additional work. You need additional supervision. You need additional general contractor, general conditions type fees. And the way you calculate that is based on a percentage that's in the subcontract. And that's how the calculation went. And it's for those additional general conditions during that four months. So tell us in your remaining time about bad faith and prejudgment interest. Yes, so quickly on bad faith. We filed two specific bad faith counts. One in common law, one under the statutory fee shifting statute. I'll take the last one first. The fee shifting statute is something that you cannot address until after judgment. That comes out of the Tiger Fiber case in the EDVA. It specifically says we don't look at the fee, I'm sorry, the statutory request for fees until the end. On the common law side, there's a multi-factor test that's supposed to be applied. As you can imagine, bad faith is a very fact-intensive question. Judge Brinkema decided to dismiss all of that on grounds that Berkeley did not state. Berkeley's view was there is no coverage, and therefore there can be no bad faith. That is all that they really argued. They also stated at some point that the coverage question was reasonably debatable. And I think Judge Brinkema said, all right, well, I just don't see, what she said was, I don't see any evidence of bad faith, so I'm going to go ahead and dismiss that. But that's a ground that Berkeley didn't have. Let's assume you have a bad faith claim. What would be the damages that are not covered by the existing verdict? What are your additional damages? For one, all of the legal fees that it has taken for the two and a half years that we've been fighting this case, all of that would be compensable under the bad faith. And that is a very large number. In addition to, we have additional costs to go after GMP, right? We did identify, and now I'm in my rebuttal, so I can hold that. Can he have 30 more seconds to do prejudgment interest? So we moved over to the cross appeal here on the prejudgment interest. You got $260,000, $290,000. Nobody quibbles with the fact that the 6% was the proper rate of interest. Judge Brinkema refers to your calculations as convoluted. And I was worried about if we remand this so much, if we remand for redoing prejudgment interest calculations, that just keeps the meter running. With the greatest respect, it may be a field day for lawyers, but there's an advantage with these prejudgment interest calculations to following the default rule and have the time that the calculation of prejudgment interest be from the time that the complaint is filed, because that's when the other party, if there's an insubstantial complaint, which you contend the other folks filed, at that point when the complaint is filed, at that point you become entitled to the money. And that's a day certain. And so what we do by upholding the district judge here is say to the district judges, you can, here's a clean rule, here's the default rule, the date that the complaint is filed. And having that done, as opposed to going through all these different convoluted calculations, just there's, at some point, there is a virtue to simplicity and clear appellate direction. I certainly understand. You mentioned that in the last segment as well, and I agree. The issue here is that the standard is, when did CBG lose use of its funds? Berkeley denied coverage in February, I'm sorry, in August 2021. It denied coverage again in February, 2022, and it didn't file its complaint until October. So for identifying a simple date, the day they denied coverage. I read all that with interest in your view, and that is that the pre-judgment interest should have kicked in way before the date that the complaint is filed. You got $290,000. I don't blame you for wanting more, but I'm just saying there are costs for future cases on this kind of thing, because normally in calculations of loss and pre-judgment interest, we take a calculation of pre-judgment interest as pretty much a trial court matter. Those kinds of pre-judgment interest calculations are not things that we just lightly reverse. And to send you all back on an argument that goes this way and that, I mean, there are costs to that. I think the rule should be from the date of denial. That is a simple, that's the date at that moment, CBG is not entitled to any coverage. Didn't that turn on when the final protocol was submitted to Berkeley? No, I mean, so we gave notice on June 7th. They denied August 11th. So within a few weeks of giving notice, coverage was completely and formally denied. And so the protocol was- They had a basis for denying it. I mean, that's the point. The whole thing is tied up with the question of whether they acted in good faith. And we would ask the court to remand for the bad faith question, for an evidentiary hearing on the bad faith. You know, that again is something a district court would have a good look at. And you tried to make it, the notice period be something like 90 days. And at any rate, she thought that the notice was reasonably given when it was given within 30 days of the stop order, stop work order. And it just seems to me those, the questions here that weren't questions for the jury were questions in which the district court would have a preeminently, I'm speaking with respect to the cross appeal now, that those questions, questions in the direct appeal that seem to be jury questions in a lot of ways, the questions on the cross appeal seem to be questions with prejudging interest and ensure a bad faith that district judges would have a particularly favorable advantage point as opposed to an appellate court. Frankly, as a bottom line, I just can't agree with where I'm coming from. And that is, I think the district judge did a fine job with this case overall. You can, you know, you can pick out of here, pick out there, but Judge Brinkman did a good job. I know this is good district court work. I would not argue except for one quibble. We were not able to put on evidence of bad faith. That's it. We weren't able to put on that evidence and we'd like to appreciate your time. Everybody has a quibble. All right, Mr. Gold, let's hear you, sir. I'm gonna focus on one thing in my rebuttal, and that is the offsets. The calculation of the damages, and these were issues that were not given to the jury. They were specifically set aside and left for Judge Brinkman to deal with on the post-trial motions. One has to do with the settlement with GMP. CBG recovered the same money twice. They recovered, and it's important to remember, this is a- The settlement with GMP did not make CBG whole, if that's what you're referring to. Well, that was not something that CBG proved below, but the policy says we get made whole before they do. And so the- I thought the district court's rationale on that point was the first material breach. But the rule about first breach only applies if- It doesn't obviate the need to apply the conditions and terms of the policy. It doesn't give CBG the right to ignore the subrogation provision. It- If the district court found there was a first material breach with regard to the CBG or the GMP payment, what do you say is error? The district court did not find that, but if it had, the- Well, what did- I mean, I thought that that was the basis for the district court's ruling on that point. Am I just incorrect? I don't know the district court's- the basis for the district court's ruling on the GMP settlement issue. The breach requiring Berkeley to pay, as the judgment did, does not- still means that you've got to apply the conditions of the policy. And the suggestion that CBG did indeed make, although that it had not been made whole, was just an argument. It was not something that they proved. And the provisions of the policy specifically say that if there is a recovery from an actual responsible party such as GMP here, that that money goes first to repay Berkeley and not first to repay CBG. The party specifically negotiated that provision. But if Judge Brigham has said it was the first material breach, if she said that, do you disagree? She may have said that. Isn't that the rule of the case? That rule does not say you don't apply the conditions of the contract. So it doesn't say forget about what the policy says about recovering from a third party if Berkeley didn't provide coverage. And we argue this in the briefs. That rule does not apply here. The conditions for coverage still have to be applied. For example, you would still apply the policy limits. You wouldn't say that because CBG declined to provide coverage, the policy limits wouldn't apply. You still apply the terms of the policy. We had a dispute about what the policy required. That dispute was resolved. We therefore are required to pay what the policy requires, but only what the policy requires. We don't forget about all the terms and conditions of the policy. We're just enforcing the policy according to what the court has decided the policy needs. And likewise, the costs that CBG itself incurred, they might be covered if this was a property insurance. In other words, if there were damage to property and CBG was having to repair its own property and incurred its own costs, you might have coverage in that situation. This is a liability policy. Their coverage is limited to what they were legally obligated to pay to someone else. Legally obligated in tort to pay to someone else, not their own internal costs. And so that's why the calculated costs, and they're purely fictional calculations. They're just percentages of other numbers that notionally have some relationship to their own internal costs. But they're not actual internal costs. They don't have invoices. They don't have checks that they're written. They're just percentage numbers. And they include some markup for profit. And that might be, as I say, that might be covered if they bought insurance for that. But this is liability insurance for amounts they're legally obligated to pay to someone else as a matter of under a tort claim. And these were not costs that they were required to pay to someone else. You've got to, even if the court was, the district court was correct in determining that the policy applied to this claim, it only applied, it only provided the coverage that is stated in the policy. And that coverage does not apply to their own costs. And it does require an offset for the GMP settlement because of the subrogation provision that is triggered once there's payment of benefits under the policy. Thank you for your time. Thank you, sir. Thank you. Mr. Gold, you have three minutes for rebuttal if there's anything that you wanted to say. Two very, very quick points on that last piece. First, Judge Ringeman did find the first material breach. But even if she didn't explicitly state it, they issued an insurance policy. They didn't provide coverage that was owed. That is a first material breach. And when that happens, insurance companies do not get the benefit of any provision, let alone a subrogation provision that gets them to claw back dollars. They did nothing to recover that money. CBG paid out of pocket to go after GMP and obtain a settlement. And they made whole rule applies. Second, they're not ever going to pay anything under the policy. They're paying because of a jury verdict and a judgment for breach of contract. Those are damages flowing from a breach. It's not policy proceeds. So they are simply not entitled to any dollar. And despite all of the pre-judgment interest and everything else, CBG will never be made whole for this entire case and the two years worth of misery they've been put through. That's all. Thank you. All right. We thank you. We appreciate both of your arguments. And we'll adjourn court. And we'll come down and read counsel. Thanks to our courtroom deputy for her help as well. This honorable court stands adjourned until tomorrow morning.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd